IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RACHAEL ANNE PORTEOUS,<br><br>　　　　　　　Petitioner,<br><br>vs.<br><br>D. K. JOHNSON, Warden,<br>Central California Women's Facility,<br><br>　　　　　　　Respondent. | No. 2:14-cv-00023-JKS<br><br>MEMORANDUM DECISION |

　　　Rachael Anne Porteous, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Porteous is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Central California Women's Facility.  Respondent has answered, and Porteous has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

　　　On July 14, 2008, Porteous was charged in Superior Court case number CM029144 with assault with a deadly weapon (a "white Lincoln Towncar"), driving under the influence of alcohol and/or drugs, and being under the influence of a controlled substance.  She subsequently entered a no contest plea to assault with a deadly weapon and misdemeanor driving under the influence in exchange for the dismissal of the third count and some other cases against her, with an agreement that the court could consider the dismissed count and cases at sentencing.

　　　On October 23, 2008, a felony complaint was filed in case number CM029772 charging that, on October 21, 2008, Porteous murdered Theresa Kay Shaw.  The complaint further alleged that Porteous had personally used a deadly and dangerous weapon (a Samurai sword), committed the offense while released from custody on bail or her own recognizance in case number

CM029144, and had suffered a prior conviction for assault with a deadly weapon in case number CM029144 that was a serious felony and a strike.  Porteous pled not guilty in case number CM029772 and denied the allegations.  On direct appeal of her conviction, the California Court of Appeal  described the following events underlying the charges against her:

### Case No. CM029144

On July 10, 2008, [Porteous] was under the influence of methamphetamine and arrived at a home on B Street in Oroville.  During an altercation between [Porteous] and another person, [Porteous] got in her car, accelerated it toward the other person, and hit the person and his car with her car.

### Case No. CM029772

On the evening of October 20, 2008, [Porteous] arrived at the home of her mother, Theresa S.  Residing with Theresa at the time were her daughter and [Porteous's] sister, Alicia S., Alicia's boyfriend, Bryan H., and three of [Porteous's] children, including J.G.

At approximately 10:00 p.m. that evening, Alicia and Bryan went to bed.  At  or around 11:50 p.m., J.G. departed for work.  At the time, [Porteous] was in the living room of the residence and Theresa was in her bedroom upstairs.

At approximately 2:00 a.m. the next morning, Alicia and Bryan got up to use the bathroom.  Alicia saw lights coming from upstairs and went to investigate.  She found [Porteous] in Theresa's bedroom walking around the bed.  She also saw blood on the bed.  Alicia grabbed [Porteous], shook her and asked what she had done.  [Porteous] said she did not do anything.  Alicia then saw Theresa lying on the floor half in and half out of a closet with blood on her.

Alicia screamed and ran to her mother.  Theresa was still alive and told Alicia to get [Porteous] out of the room and that [Porteous] was trying to kill her.  Bryan, who had come to the room in response to Alicia's scream, called 911 and gave the phone to Alicia.  Alicia spoke to the operator and then she and Bryan forced [Porteous] out of the room.  During the 911 call, [Porteous] could be heard saying, "Mom you know, I didn't do that."

Theresa had received 10 stab wounds, nine on her back and one on her neck.  One of the back wounds penetrated Theresa's chest wall, fractured a rib and entered her lung.  She later died from loss of blood due to the stab wounds.

Responding officers found a wooden sword with blood on it against the wall in the closet of Theresa's bedroom.  Theresa told the officers her daughter had stabbed her.  The sword was one of several owned by J.G., who used them for martial arts training.  J.G. had previously shown [Porteous] how to use them.

At approximately 5:00 a.m. the morning of the killing, the police found [Porteous] nearby.  She had a "vacant" look and appeared to be "spaced out."  [Porteous] was taken to the police station, read her *Miranda* rights and interviewed.  During the interview, [Porteous] admitted stabbing her mother, explaining that she "had to."  [Porteous] said

she was tired of seeing her mother in pain.  [Porteous] also said she had been thinking
about killing her mother for days.

*People v. Porteous*, No. C064606, 2013 WL 1093221, at *1-2 (Cal. Ct. App. Mar. 18, 2013).

Porteous subsequently entered an additional plea of not guilty by reason of insanity, and
the court appointed two mental health experts, Drs. Caruso and Schmidt, to evaluate her.  The
court also granted Porteous' motion to bifurcate the strike, prior serious felony conviction, and
released from custody allegations from the jury trial on the charged crime.

Prior to the jury trial, Porteous moved to exclude from the guilt phase of the trial
evidence of her post-arrest statement to a police detective on grounds that it was obtained in
violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  The court conducted an evidentiary
hearing on the issues of whether Porteous' waiver of her *Miranda* rights was knowing and
intelligent and whether the statement that followed was voluntary.  After hearing argument from
both parties, the court ruled that the waiver was knowing and intelligent and the statement was
voluntary.  It consequently denied Porteous' motion.

At the conclusion of the guilt phase of trial, the jury found Porteous guilty of first-degree
murder and found true the personal use allegation.  Because Porteous waived her right to a jury
trial on the bifurcated allegations, the court conducted a trial on those and found them to be true.

During the sanity phase of Porteous' jury trial, Porteous moved to exclude testimony
from prosecution witness Dr. Wilson, who, at the request of the prosecution, had interviewed
Porteous after her arrest.  Porteous argued that the evidence was inadmissible because Porteous
had not waived her patient-psychologist privilege, it was obtained in violation of *Miranda* and

3

Porteous' right to counsel, and the testimony violated California Evidence Code § 352.[1]  After conducting an evidentiary hearing and considering argument from the parties, the court ruled that the interview was voluntary and that Dr. Wilson could testify regarding his observations of Porteous' conduct and demeanor during the interview as well as offer an expert opinion on her sanity at the time of the crime.

At the conclusion of the sanity phase, the jury found that Porteous was sane at the time the murder was committed.  The defense then moved for a new trial based upon the trial court's response to a question from the deliberating guilt phase jury about the definition of the word "deliberate," as required for a conviction for first degree murder.  The court denied the motion.  It subsequently sentenced Porteous in case number CM029144 to the upper term of 4 years' imprisonment for assault with a deadly weapon, with concurrent jail time for driving while intoxicated.  In case number CM029772, it sentenced Porteous to 25 years to life imprisonment, doubled by the strike to 50 years to life and enhanced by 5 years for the prior serious felony conviction, 2 years for committing the murder while released from custody in case number CM029144, and 1 year for the personal use of a deadly or dangerous weapon.  The court also ordered Porteous to pay restitution to both the family of the victim and the State Board of Control.

Through counsel, Porteous appealed her conviction, arguing that: 1) the trial court erred when it refused to exclude her post-arrest statement to law enforcement; 2) the trial court diluted

---

[1]     That section grants courts discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  CAL. EVID. CODE § 352.

the meaning of "deliberation" when responding to the jury's question; 3) the trial court's erroneous admission of Dr. Wilson's testimony at the sanity phase of the trial prejudiced her and warranted reversal of the jury's sanity finding; 4) the trial court erred in determining that her interview with Dr. Wilson was voluntary; 5) the court's instruction to the jury on insanity was erroneous with regards to the mental conditions that could contribute to a finding of insanity; 6) the existence of cumulative error warranted reversal of her conviction; and 7) the abstract of judgments in both cases should be amended to correct the restitution amounts and fees imposed upon her.  The People conceded the errors in the abstracts as to the restitution amounts and fees but otherwise opposed the appeal.  In a reasoned, unpublished decision, the Court of Appeal ordered the correction of the abstracts of judgment and also agreed with Porteous that the trial court "watered down the applicable standard for deliberation," which was not harmless beyond a reasonable doubt.  *Porteous*, 2013 WL 1093221, at *5-9, *13-14.  The appellate court thus reversed the conviction for first-degree murder and allowed the People an opportunity to elect to retry Porteous for first-degree murder.  *Id.* at *9.  If the People chose not to do so, the appellate court ordered that the conviction be reduced to second-degree murder, as the jury's verdict was sufficient to support that conviction.  *Id.*  Porteous's Petition in this Court indicates that the People chose not to retry her, and thus her conviction was reduced to second-degree murder.

Porteous moved for rehearing in the Court of Appeal, which was summarily denied on April 10, 2013.  Through counsel, Porteous also petitioned for review in the California Supreme Court.  The petition was denied without comment on June 26, 2013.

Porteous timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on December 12, 2013.

## II. GROUNDS/CLAIMS

In her *pro se* Petition before this Court, Porteous raises four grounds for relief.  First, she argues that the trial court erred when it declined to exclude on *Miranda* grounds her post-arrest statement to law enforcement.  She additionally contends that the trial court's admission of Dr. Wilson's testimony violated *Miranda* and prejudiced her.  Third, she avers that the trial court erred when it determined that her interview with Dr. Wilson was voluntary.  Finally, she claims that the jury instruction on her insanity defense improperly limited the causative factors that the jury could consider.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Here, the only decision on Simmons' collateral review claims was a summary denial by the California Supreme Court on habeas review, which is an adjudication on the merits and entitled to deference. *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Porteous has not replied to Respondent's answer.  The relevant statute provides that

"[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show

cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the

extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also*

*Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no

evidence offered to contradict the allegations of the return, the court must accept those

allegations as true.  *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

Ground One:                                    Admission of Post-Arrest Statement in Guilt Phase

Porteous first contends that her post-arrest statement to law enforcement should have

been suppressed on *Miranda* grounds.  The Court of Appeal laid out the following facts

underlying this claim:

> [Porteous] was arrested on the morning of the offense and was interviewed at the
> police station by Detective Jason Barkley at approximately 6:13 a.m.  The police
> attempted to create a video recording of the interview, but this failed due to technical
> difficulties.  Barkley himself recorded the first part of the interview, which included his
> explanation to [Porteous] of her *Miranda* rights.  That recording is in the appellate
> record. The People have provided the following transcription of the relevant portion of
> that recording, which [Porteous] does not contest:
>
> > "[Barkley]: Okay.  How about I read you your rights and you tell me if you
> > understand those?
> > "[Porteous]: Okay.
> > "[Barkley]: Okay.  You have the right to remain silent.  Anything you say may be
> > used against you in court.  Do you understand that?
> > "[Porteous]: Like I can be in trouble?
> > "[Barkley]: Well what it means is that, um, you don't necessarily have to talk to
> > me.  That um, but if you do choose to talk to me it could—it could what you say,
> > it could go to court.
> > "[Porteous]: (Unintelligible).
> > "[Barkley]: Does that make sense?
> > "[Porteous]: Yeah.

"[Barkley]: You sure?

"[Porteous]: Mm-hmm.

"[Barkley]: Huh?

"[Porteous]: I understand.

"[Barkley]: Okay.  Um, is there any part of the . . .

"(Unintelligible).

"[Barkley]: Well we're going to talk about that.  Um, can you—can you tell me back what—what I just said?  Um . . .

"[Porteous]: I have the right to remain silent.

"[Barkley]:  Okay.  What does that mean to you?

"[Porteous]: (Unintelligible).

"[Barkley]: Okay.  And if you do talk . . .

"[Porteous]: Mm-hmm.

"[Barkley]: . . . it could possibly end up in court.  You understand that?  Like the things that you say may end up in court.  You understand?

"[Porteous]: Oh.

"[Barkley]: If something that was ever to go to court . . .

"[Porteous]: (Unintelligible).

"[Barkley]: You understand?

"[Porteous]: If I go to court for something . . .

"[Barkley]: Mm-hmm.  What you tell me could be used.  You understand?

"[Porteous]: Okay (unintelligible).

"[Barkley]: Okay.

"[Porteous]: (Unintelligible).

"[Barkley]: You have the right to the presence of an attorney before or during any questioning, if you want.

"[Porteous]: Uh-huh.

"[Barkley]: Do you understand that?

"[Porteous]: Yeah.

"[Barkley]: Okay, can you tell me what that means?

"[Porteous]: Mmm, um . . . um, like I can have an attorney present.

"[Barkley]: Okay with a lawyer during questioning if you want.  Do you understand that?

"[Porteous]: Uh-huh.

"[Barkley]: Okay.  If you can't afford an attorney, one will be presented to you free of charge . . .

"[Porteous]: Uh-huh.

"[Barkley]: . . . by the court before or during any questioning if you want.

"[Porteous]: Okay.

"[Barkley]: Do you understand that?

"[Porteous]: Yes.

"[Barkley]: Okay.  Is there any part of that, what I just told you, that you don't understand or that you have questions about?

"[Porteous]: Mm-mm.

9

"[Barkley]: So you think you understand what I'm talking about?
"[Porteous]: Kind of.
"[Barkley]: Okay."

*Porteous*, 2013 WL 10932, at *3-4.

As previously mentioned, the trial court held an evidentiary hearing with regard to whether Porteous' waiver was involuntary.  Detective Barkley testified at the evidentiary hearing that he had reviewed the transcript of Porteous' statement, and the transcript was cited during his cross-examination about the *Miranda* advisement.[2]  He opined that Porteous wanted him "to believe that she was confused about what happened," or wanted him to believe she "was more confused than she was."  He opined that she was not confused about her "physical surroundings" and knew that he was a police officer.  Barkley opined that she was "lucid" and "[f]airly" clear "in terms of her speech," although she sometimes gave inaudible responses and "would mumble at times."  She maintained eye contact with him and gave "unambiguous" responses, depending "on how comfortable she was with the question."  She "never stopped during the interview and asked more questions about her rights."  She did at one time state that she did not "want to talk right now."  Porteous had become "emotional," may have been "tearing up," and appeared "to

---

[2]        The record indicates that the audiotape of Porteous' statement as well as a transcript of the recording were marked for identification at the time of the evidentiary hearing, but the parties were unable to locate the transcript of the recording for inclusion in the record on appeal.  The summary of the record as quoted in the appellate decision was Respondent's "best effort" to transcribe that exchange in its opposition to Porteous' appeal.  It is therefore unclear whether the trial court was able to clarify the "unintelligible" remarks from the transcript of the statement provided during the evidentiary hearing.  Importantly, however, Porteous did not contend on direct appeal, and does not argue before this Court, that any of the "unintelligible" remarks demonstrated that her waiver was involuntary and unknowing. Rather, she relies on her statements "like I could be in trouble?" and that she "kind of" understood her right to an attorney, both of which are clearly indicated in the summary reviewed by the Court of Appeal. Nor did appellate counsel contend that Respondent's transcription of the conversation was erroneous.

need a break" at that point, so Barkley gave "her some time basically," then took her outside for about ten minutes so she could "pull her emotions together" before he asked if she "was ready to continue."

In *Miranda*, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444.  Under this rubric, an interrogating officer must first advise the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her prior to engaging in a custodial interrogation.  *Id.* at 473-74.  Once *Miranda* warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease."  *Smith v. Illinois*, 469 U.S. 91, 98 (1984).

A defendant may waive his *Miranda* rights so long as the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A valid waiver of *Miranda* rights depends upon the totality of the circumstances.  "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Although some earlier Supreme

11

Court cases had indicated the government had a "heavy burden" to show waiver, *Berghuis*

explained that the burden is not too onerous. *Berghuis*, 560 U.S. at 384. Indeed, the waiver may

be implied by conduct, and need not be explicit or written. *Id.* at 383.

> If the State establishes that a *Miranda* warning was given and the accused made
> an uncoerced statement, this showing, standing alone, is insufficient to demonstrate "a
> valid waiver" of *Miranda* rights. The prosecution must make the additional showing that
> the accused understood these rights. Where the prosecution shows that a *Miranda*
> warning was given and that it was understood by the accused, an accused's uncoerced
> statement establishes an implied waiver of the right to remain silent. . . . As a general
> proposition, the law can presume that an individual who, with a full understanding of his
> or her rights, acts in a manner inconsistent with their exercise has made a deliberate
> choice to relinquish the protection those rights afford.

*Berghuis*, 560 U.S. at 384-85 (citations omitted).

In this case, the state appellate court properly considered the totality of the circumstances

in determining whether Porteous understood and voluntarily waived her *Miranda* rights, after

which it concluded:

> Barkley first obtained assurances from [Porteous] that she understood each of her
> *Miranda* rights individually. [Porteous] repeated to Barkley that she had the right to
> remain silent and stated she understood anything she said could be used against her in
> court. [Porteous] indicated she understood she had the right to an attorney and that, if she
> could not afford an attorney, one would be provided for her at no charge. Finally,
> Barkley asked if [Porteous] understood what he was talking about and she said, "[k]ind
> of." [T]his last response did not necessarily signify confusion or lack of understanding,
> especially given [Porteous'] earlier responses. At the suppression hearing, Barkley
> testified that it appeared [Porteous] was trying to make him believe she "was more
> confused than she was." The trial court concluded [Porteous] had "freely, knowingly,
> and voluntarily" waived her *Miranda* rights. Based on the totality of the circumstances,
> including lack of any coercion, intimidation or the like, and [Porteous'] overall responses
> to Barkley's questions regarding [Porteous'] rights, substantial evidence supports that
> conclusion.

*Porteous*, 2013 WL 1093221, at *4.

That conclusion was not an unreasonable determination of the facts in light of the record.

The record reflects that Officer Barkley explained each of Porteous' *Miranda* rights before

12

obtaining affirmative responses that she understood each of those rights.  It does, however, give

this Court pause that Officer Barkley did not request further clarification in response to Porteous'

statement that she "kind of" understood her rights when he asked, in summary, whether she

understood.  "[W]hen a suspect makes an ambiguous or equivocal statement it will often be good

police practice for the interviewing officers to clarify whether or not he actually wants" to

invoke the privilege.  *Davis v. United States*, 512 U.S. 452, 461 (1994).  Indeed, clarifying

questions "minimize the chance of a confession being suppressed due to subsequent judicial

second-guessing as to the meaning of the suspect's statement." *Id.*  However, the Supreme Court

has expressly "decline[d] to adopt a rule requiring officers to ask clarifying questions."  *Id*. at

461.  Rather, "[i]f the suspect's statement is not an [] unambiguous or unequivocal request for

counsel, the officers have no obligation to stop questioning." *Id.* at 461-62.  Porteous has not

cited any Supreme Court authority suggesting that Officer Barkley was not entitled to rely on her

prior unequivocal acknowledgments that she understood each of her *Miranda* rights, and this

Court is not aware of any.  Moreover, the trial court apparently found credible and relied on

Officer Barkley's testimony during the evidentiary hearing that Porteous appeared to understand

her rights and wanted to appear more confused than she actually was.  At least one sister Circuit

Court of Appeal has held that a defendant's comprehension of his rights are to be judged from

the perspective of the police.  *See United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010)

("Both the voluntariness and comprehension aspects of the waiver inquiry should be examined

primarily from the perspective of the police, such that where [the] police had no reason to

believe that [the defendant] misunderstood the warnings, . . . there is no basis for invalidating

[the] *Miranda* waiver.").

13

The Court of Appeal further considered the totality of circumstances when it rejected Porteous' argument that she invoked her right to remain silent during the course of the interview, and determined that the trial court's conclusion that Porteous merely "indicated a desire to take a break from questioning" was supported by the record. *Id.* at *5. This conclusion is also reasonable and supported by the record. *See Maldonado v. Subia*, 534 F. App'x 671, 674 (9th Cir. 2013) (opining that "[a] reasonable reading of the record supports the finding that [the defendant] wanted to see his mother because he missed her, not because he wanted to invoke his right to counsel or to remain silent"). In light of *Berghuis*, 560 U.S. at 383, this Court does not find that the state court's determination that Porteous' statements were not unknowing or unintelligent within the meaning of the Due Process Clause contravenes or unreasonably applies federal law, particularly given how uncertain settled law is in the area of waiver, *see Salinas v. Texas*, 133 S. Ct. 2174, 2179-83 (2013); *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). Porteous is therefore not entitled to habeas relief on this claim.

Grounds Two and Three:      <u>Admission of Dr. Wilson's Testimony in Sanity Phase</u>

Porteous next claims, as she did on direct appeal, that the trial court made two errors in the sanity phase of her jury trial with respect to its admission of the testimony of Dr. Wilson, who interviewed Porteous at the request of the district attorney's office shortly after her arrest. Porteous argues that Wilson's testimony should have been excluded because: 1) her statements to Wilson were obtained in violation of *Miranda*; and 2) she did not voluntarily agree to the interview. The Court of Appeal described the following underlying facts:

> Immediately before the interview, Detective Barkley read [Porteous] her *Miranda* rights, and she indicated she did not want to talk to the doctor. Barkley nevertheless brought Dr. Wilson into the interview room. Barkley told [Porteous] that she could stop the conversation at any time and suggested that they "just give it a try." Barkley

14

introduced Dr. Wilson and then left the room.  Wilson informed [Porteous] he was not interviewing her for purposes of treatment and that her statements to him were not thereby privileged.  He then proceeded to interview [Porteous].

[Porteous] argued at trial that her statements to Dr. Wilson were obtained in violation of *Miranda*.  She also raised other objections not relevant here.  The trial court indicated it did not believe *Miranda* was applicable to the matter, because Dr. Wilson would not be testifying about incriminating statements made by [Porteous] during the interview but about his observations and impressions of [Porteous].  The court analogized the evidence to "fingerprints, DNA testing, that type of thing."  However, the court further indicated that, if it were to rule on the *Miranda* issue, it would conclude the advisements were inadequate and that [Porteous'] waiver was not freely, knowingly and intelligently made.  In other words, there had been a *Miranda* violation.

Wilson thereafter testified that [Porteous] was responsive to his preliminary questions and did not demonstrate any psychotic behavior.  He opined that [Porteous] did not meet the legal test for insanity.  In Wilson's opinion, [Porteous] had the capacity to understand the quality of her acts and to tell the difference between right and wrong.  He further opined [Porteous] met the criteria for borderline personality disorder but it could not be determined if she suffered either from Axis I bipolar disorder or a methamphetamine-induced disorder which, he indicated, closely resemble each other.

*Porteous*, 2013 WL 1093221, at *9-10.

On appeal, the prosecution conceded that, based on the trial court's finding, the introduction of Dr. Wilson's testimony violated Porteous' *Miranda* rights, but argued that the admission was not prejudicial to Porteous.  The Court of Appeal assumed, without deciding, that *Miranda* applied to the testimony and nonetheless agreed with the prosecution that the admission was harmless beyond a reasonable doubt:[3]

---

[3]     It is not entirely clear whether Porteous' *Miranda* rights were violated.  The Supreme Court has held that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Estelle v. Smith*, 451 U.S. 454, 468 (1981).  The Ninth Circuit has held, however, that *Estelle* does not control where the defendant "present[s] an insanity defense and introduce[d] psychiatric testimony in support of that defense."  *Leiva v. Cate*, 358 F. App'x 972, 973 (9th Cir. 2009); *see also Buchanan v. Kentucky*, 483 U.S. 402, 424 (1987) (allowing use during trial of psychiatric evidence obtained at a pre-trial psychiatric evaluation to rebut the defendant's presentation of contrary psychiatric reports).  Indeed, it appears that the Dr. Wilson's testimony was limited to his opinions regarding Porteous' competency and was not used to prove elements of the State's

As presented by the expert testimony, the question here was whether [Porteous] suffered from an Axis I bipolar disorder which rendered her legally insane, as the lone defense expert testified, or some other condition not amounting to legal insanity, such as a substance-induced condition that mimics bipolar disorder or a personality disorder, as the prosecution's experts testified.  As we shall explain, Dr. Wilson added little to the testimony of the other two prosecution witnesses and did not foreclose the possibility that [Porteous] suffered from a bipolar disorder, as the defense expert testified.

The defense expert, Dr. Kevin Dugan, testified that certain testing of [Porteous] revealed the presence of psychotic features, delusions and hallucinations.  He opined that [Porteous] suffers from a chronic bipolar I disorder, the severity of which depends upon whether she is taking her medications or is instead using street drugs.  Dr. Dugan further opined [Porteous] did not understand the wrongfulness of her conduct and she met the legal definition of insanity.

The first prosecution expert to testify was Dr. Kent Caruso, who indicated [Porteous'] history reveals a substance-induced emotional disorder under Axis I, which creates symptoms consistent with bipolar disorder.  He further opined there was no evidence [Porteous] was psychotic, delusional or experiencing hallucinations at the time of the offense.  According to Dr. Caruso, bipolar disorder is relatively rare and where, as

---

case.  *See United States v. Ives*, 504 F.2d 935, 953 (9th Cir. 1974), *judgment vacated on other grounds by Ives v. United States*, 421 U.S. 944 (1975), (rejecting defendant's contention that psychiatrist who examined defendant on behalf of the prosecution should have given *Miranda* warnings because "[t]he psychiatrist's interviews with [defendant] were not to gain evidence of guilt or innocence of the charge, but rather for the purpose of determining his mental capacity"); *Gonzales v. Walker*, No. 02-02279, 2010 WL 3893577, at *22 (N.D. Cal. Sept. 30, 2010) (holding that court-ordered psychiatric evaluation performed without a *Miranda* warning was not contrary to Supreme Court precedent where the State used the evidence not to prove its affirmative case but to rebut defendant's testimony as to his competency).

On the other hand, in those above-cited cases defense counsel was at least notified of the evaluation (*Leiva*) or requested it (*Buchanan* and *Gonzales*).  *See Pawlyk v. Wood*, 248 F.3d 815, 827-28 (9th Cir. 2001) ("*Estelle* and *Buchanan* established, and placed counsel on notice, that when a defendant places his mental status at issue and presents favorable evidence from a psychiatric evaluation, he waives confidentiality as to evaluations unfavorable to his defense.") Here, however, the record does not indicate that Porteous even had counsel at the time.  It is therefore arguable that the questioning was a denial of assistance of counsel under the Sixth Amendment.  *See Smith*, 451 U.S. at 465 (court-ordered psychiatric evaluation conducted without informing defense counsel the examination was taking place was denial of assistance of counsel).  In any event, because the harmlessness determination is dispositive in this case, the Court declines to determine whether *Miranda* applies and will proceed directly to the harmlessness inquiry.  *See, e.g.*, *Woods v. Johnson*, 75 F.3d 1017, 1026-28 (5th Cir. 1996) (holding that testimony of psychiatrist who had examined defendant for competency prior to trial without adequate *Miranda* warnings and without opportunity to first consult with counsel was not so harmful as to entitle defendant to habeas relief).

here, there is a history of methamphetamine addiction, it cannot be determined if the person's symptoms are the result of that addiction or a bipolar disorder.

Dr. Wilson was the next prosecution expert to testify. He indicated he met with defendant the day following the killing and she did not demonstrate any psychotic behavior. According to Dr. Wilson, [Porteous] did not meet the legal definition of insanity because she had the capacity to understand the quality of her acts and to tell the difference between right and wrong. Like Dr. Caruso, Dr. Wilson indicated the symptoms of a methamphetamine-induced condition closely resemble those of bipolar disorder and it is difficult to determine which condition applies to [Porteous]. Dr. Wilson further opined [Porteous] met the criteria for a borderline personality disorder.

The final prosecution expert was Dr. Deborah Schmidt. Dr. Schmidt opined that [Porteous] did not have a settled condition preventing her from understanding what she was doing or from being able to distinguish between right and wrong. In other words, according to Dr. Schmidt, [Porteous] was not legally insane. Dr. Schmidt further opined [Porteous] suffered from a general anxiety disorder and an alcohol and cannabis dependence disorder. However, Dr. Schmidt did not rule out bipolar disorder altogether.

Thus, all three prosecution experts testified [Porteous] suffers from a methamphetamine-induced condition. However, because the symptoms of such condition closely resemble those of bipolar disorder, the experts could not rule out the possibility that [Porteous] suffers from the latter condition. Nevertheless, all three testified [Porteous] does not meet the legal definition of insanity. In addition, Dr. Schmidt opined [Porteous] suffers from an anxiety disorder and Dr. Wilson opined [Porteous] suffers from a borderline personality disorder. Hence, the testimony of any one of these three experts added little to that of the other two.

[Porteous] argues the testimony of Dr. Wilson was important because he was the only witness to see her shortly after the murder and indicated [Porteous] was responsive to questions and did not demonstrate any psychotic behavior. That interview occurred sometime after 5:00 p.m. the next day. However, there is nothing in this record to suggest any psychotic behavior that may have been active at the time of the offense would still have been operative more than 12 hours later. On the contrary, in the interview of [Porteous] by Detective Barkley around 6:00 a.m. that day, there is no indication of any such behavior.

[Porteous] also overstates the extent to which the prosecutor relied on the testimony of Dr. Wilson. The prosecutor's argument to the jury that [Porteous] exhibited no psychosis the day of the murder is not necessarily a reference to Dr. Wilson's testimony. The percipient witnesses who observed [Porteous'] actions leading up to and after the killing did not describe any psychotic behavior. Nor did Detective Barkley, who interviewed her even closer to the event. And while Dr. Wilson opined that [Porteous] was not legally insane at the time of the offense, that opinion merely corroborated those of the other two prosecution witnesses. The prosecutor did mention that Dr. Wilson failed to notice any delusions or hallucinations on the part of [Porteous]. However, there was in fact no evidence presented that [Porteous] was delusional or hallucinating at the time of the crime. At most, the defense expert testified that [Porteous] had suffered delusions and hallucinations in the past.

17

Thus, two other prosecution experts opined that [Porteous] suffered from a methamphetamine-induced condition and did not satisfy the legal definition of insanity. And, because Dr. Wilson testified that the symptoms of a methamphetamine-induced condition closely resemble those of bipolar disorder, his testimony did not foreclose the possibility that [Porteous] suffered from the latter condition. Finally, the prosecution made little use of Dr. Wilson's testimony in arguing for a finding of sanity. Under these circumstances, we conclude that if the introduction of Dr. Wilson's testimony was error, it was harmless to the outcome of the case.

*Porteous*, 2013 WL 1093221, at \*10-11.

Porteous fares no better on federal habeas review, under which a *Miranda* violation is also subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 295-96 (1991). In accordance with this review, habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008).[4] Porteous fails to satisfy that burden. An independent review of the record reveals that, as the Court of Appeal thoroughly explained in its detailed analysis of the relevant testimony, Dr. Wilson's testimony was cumulative of and not sufficiently distinct from other testimony proffered by the prosecution and was not heavily relied upon by the prosecution. Thus, the state appellate court's rejection of Porteous' claim was neither contrary to, nor an unreasonable application of, controlling principles of United States Supreme Court precedent.

Likewise, the state court's reasonable conclusion that the admission was harmless dooms Porteous' independent but related claim that the testimony should have been excluded because

---

[4]    The Supreme Court recently clarified that *Brecht* incorporates the requirements of § 2254(d) (AEDPA). *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). Thus, if a state court has determined that a trial error was harmless, "a federal court may not award habeas relief under § 2254(d) unless *the harmlessness determination itself* was unreasonable." *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)) (emphasis in original).

the statements were obtained involuntarily.  Accordingly, Porteous cannot prevail on either claim

relating to the admission of Dr. Wilson's testimony.

Ground Four:                              Jury Instruction on Insanity Defense

Finally, Porteous claims that the trial court erred in instructing the jury as to what

constitutes a mental disease or defect for purposes of an insanity defense.  The Court of Appeal

considered and rejected this claim on direct appeal as follows:

> The jury was instructed on the insanity defense pursuant to CALCRIM No. 3450.
> As given by the court, the instruction read in relevant part:
>> "You have found the defendant guilty of murder.  Now you must decide
>> whether she is, was legally insane when she committed the crime or crimes.  The
>> defendant must prove that it is more likely than not that she was legally insane
>> when she committed the crime.  The defendant was clearly insane if, number one,
>> when she committed the crime she had a mental disease or defect and number
>> two, because of that disease or defect, she did not know or understand that [sic]
>> the nature and quality of her account [sic] or did not know or understand that her
>> act was morally or legally wrong.
>>
>> "*None of the following qualify as a mental disorder or defect for purposes
>> of an insanity defense.  A personality disorder, an adjustment disorder, an
>> abnormality of personality or character made apparent only by a series of
>> criminal or antisocial acts.*  If the defendant suffered from a settled mental
>> disease or defect caused by the long term use of drugs or intoxicants, that settled
>> mental disease or defect combined with another mental disease or defect may
>> qualify as legal insanity.  A settled mental disease or defect is one that remains
>> after the effect of the drugs or intoxicants has worn off."  (Italics added.)
>
> [Porteous] contends the italicized portion of the foregoing instruction incorrectly
> prevented the jury from using the existence of a personality disorder, an adjustment
> disorder, or an abnormality of personality or character as one factor in determining if she
> was insane at the time of the murder.  [Porteous] argues the instruction should instead
> have said that none of those three things, standing alone, qualifies as a mental disease or
> defect.  According to [Porteous], the jury here could have concluded she suffered from
> both a personality disorder brought on by chronic methamphetamine use and a bipolar
> disorder and that the combination of the two rendered her legally insane at the time of the
> murder.  However, she argues, the instruction prohibited the jury from considering the
> personality disorder for that purpose.
>
> [Porteous] cites former section 25.5, which read in relevant part: "In any criminal
> proceeding in which a plea of not guilty by reason of insanity is entered, this defense
> shall not be found by the trier of fact *solely* on the basis of a personality disorder or

adjustment disorder, a seizure disorder, or an addiction to, or abuse of, intoxicating substances . . . ." (Italics added.)  [Porteous] also cites the predecessor CALJIC instructions which, she argues, did not contain the error she claims.

The People contend the CALCRIM instruction did not preclude the jury from considering a bipolar disorder in tandem with a personality disorder in deciding whether [Porteous] was insane at the time of the murder.  They argue the instruction is silent on this subject, thereby neither precluding nor encouraging such consideration.  The People further contend any defect in the instruction was not prejudicial to [Porteous], because there was no evidence [Porteous] suffered from both a bipolar disorder and a personality disorder.  The experts opined that she suffered from one or the other of those conditions, but none of the experts suggested both may have been present at the same time.  Thus, the jury was left to decide if [Porteous] suffered from a personality disorder brought on by chronic drug use or from the more severe bipolar disorder.  If the former, the instruction explained this would not be sufficient for a finding of insanity.  If the latter, this alone could have been sufficient for the jury to find [Porteous] was legally insane at the time of the murder, at least according to the testimony of the defense expert.

Assuming, as [Porteous] argues, CALCRIM No. 3450 is defective in failing to include language indicating that none of the various listed conditions, standing alone, qualifies as a mental disease or defect, we agree with the People the error was harmless in this instance.  The lone defense expert, Dr. Dugan, testified that [Porteous] suffered from chronic bipolar I disorder, the severity of which depends upon whether, at the time, she is using illegal street drugs or her medication.  He further opined defendant met the legal definition of insanity and did not understand the wrongfulness of her conduct.  However, Dr. Schmidt testified [Porteous] suffered from "general anxiety disorder and also alcohol and cannabis dependence disorder."  Dr. Wilson testified [Porteous] suffered from borderline personality disorder.  None of the prosecution witnesses opined that [Porteous] also suffered from bipolar disorder.  Hence, there was no expert who testified [Porteous] suffered from both bipolar disorder and a personality disorder, adjustment disorder, or abnormality of personality or character.  Thus, there was no occasion for the jury to decide whether the combination of a bipolar disorder and some other personality disorder rendered her legally insane.  The purported error was therefore harmless.

*Porteous*, 2013 WL 10932, at *12-13.

Because jury instructions in state trial are typically matters of state law, federal courts are

bound by a state appellate court's determination that a jury instruction was not warranted under

state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that the Supreme Court has

repeatedly held that "a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see*

*also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error,

therefore, "does not alone raise a ground cognizable in a federal habeas proceeding."

*Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable

likelihood that the jury has applied the challenged instruction in a way that prevents the

consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380

(1990).  The question is whether the instruction, when read in the context of the jury charges as a

whole, is sufficiently erroneous to violate the Fourteenth Amendment.  *Francis v. Franklin*, 471

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record.  *Estelle*, 502 U.S. at

72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn.  *Id.* at 72-73.  "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation."  *Id.*   Where the defect is the

failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law.  *See*

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

In this case, the Court of Appeal determined that, even assuming that there was error, such error was harmless because "there was no occasion for the jury to decide whether the combination of a bipolar disorder and some other personality disorder rendered her legally insane." *Porteous*, 2013 WL 10932, at *13.  It thus concluded that reversal of her conviction was not warranted on this ground.  *Id.*  A claim of jury instruction error is likewise reviewed under a harmless error standard on federal habeas review.  *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003).  The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."  *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010).

On independent review, the Court likewise concludes that any instructional error was harmless.  Porteous has not established any likelihood that she was prejudiced by the instructions or that the jury would have reached a different verdict had it received the charge Porteous now believes to be appropriate.  *Brecht*, 507 U.S. at 637.  The Court thus finds no basis to believe that Porteous' conviction was the result of an "extreme malfunction" of the state criminal justice system."  *Richter*, 562 U.S. at 102.  Porteous is therefore not entitled to federal habeas relief on this ground either.

## V. CONCLUSION AND ORDER

Porteous is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: February 11, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

23